BEFORE THE
OFFICE OF ADMINISTRATIVE HEARINGS
STATE OF CALIFORNIA

PARENT ON BEHALF OF STUDENT,

V.

ATASCADERO UNIFIED SCHOOL DISTRICT.

CASE NO. 2025010625

EXPEDITED DECISION

March 6, 2025

On January 17, 2025, Student filed a due process hearing request with the Office of Administrative Hearings, called OAH, State of California naming Atascadero Unified School District and the San Luis Obispo County Office of Education.  The complaint contained expedited and non-expedited hearing claims.  OAH set the expedited and non-expedited matters for separate hearings.  On February 4, 2025, OAH dismissed the County Office of Education from the expedited portion of the proceeding only.

The expedited claims proceeded to hearing with no continuances on February 11, 2025.  (34 C.F.R. § 300.532(c)(2)(2006).)  This Expedited Decision resolves only the expedited claims.  Administrative Law Judge Charles Marson heard this expedited matter by videoconference on February 11, 12, 13, 20, and 21, 2025.

Attorneys Colleen A. Snyder and Evan H. Harris represented Student.  Parent attended all hearing days on Student's behalf except for brief absences.  Attorneys Alyssa R. Bivens and Stephanie L. Adams represented Atascadero.  Kaitlynn Greenberg, Atascadero's Director of Student Intervention Services, attended all hearing days on Atascadero's behalf except for brief absences.  Attorney Justin R. Shinnefield represented the County Office of Education, which did not participate in the expedited hearing.

On February 21, 2025, the last day of hearing, the record was closed and the matter was submitted for decision.  The Administrative Law Judge, called ALJ, allowed the parties to file closing arguments during the submittal time.  The closing briefs were submitted and considered.

## EXPEDITED ISSUES

1.    Was the conduct for which Student was disciplined by Atascadero caused by, or did it have a direct and substantial relationship to, his disabilities?

2.    Did Atascadero fail to consider all relevant information in connection with the manifestation determination review process, namely, relevant information concerning his attention deficit hyperactivity disorder, his impulse control, his emotional and behavior regulation, and his history of fighting?

## JURISDICTION

This hearing was held under the Individuals with Disabilities Education Act, called IDEA, its regulations, and California statutes and regulations.  (20 U.S.C. § 1400 et. seq.;

34 C.F.R.  § 300.1 (2006) et seq.; Ed. Code, § 56000 et seq.; Cal. Code Regs., tit. 5, § 3000 et seq.)  The main purposes of the IDEA are to ensure:

- all children with disabilities have available to them a free appropriate public education, called FAPE, that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living, and
- the rights of children with disabilities and their parents are protected. (20 U.S.C. § 1400(d)(1); See Ed. Code, § 56000, subd. (a).)

Title 20 United States Code section 1415(k) and title 34 Code of Federal Regulations, part 300.530 et seq. (2006), govern the discipline of special education students.  (Ed. Code, § 48915.5.)  A student receiving special education services may be suspended or expelled from school as provided by federal law.  (20 U.S.C. §1412(a)(1)(A); Ed. Code, § 48915.5, subd. (a).)  If a special education student violates a code of student conduct, school personnel may remove the student from his or her educational placement without providing services for a period not to exceed 10 days per school year, provided typical children are not provided services during disciplinary removal.  (20 U.S.C. § 1415(k)(1)(B); 34 C.F.R. § 300.530(b)(1) & (d)(3)(2006).)

A parent of a special education student may appeal a school district's determination that particular conduct resulting in a disciplinary change of placement was not a manifestation of the child's disability by requesting an expedited due process hearing.  (20 U.S.C. § 1415(k)(3)(A); 34 C.F.R. § 300.532(a) & (c)(2006).)  The hearing must be conducted within 20 school days of the date an expedited due process hearing

request is filed and a decision must be rendered within 10 school days after the hearing ends.  (20 U.S.C. § 1415(k)(4)(B); 34 C.F.R. § 300.532(c)(2)(2006).)

At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence.  (*Schaffer v. Weast* (2005) 546 U.S. 49, 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].)  Here, Student filed the complaint and has the burden of proof.  The factual statements in this Decision constitute the written findings of fact required by the IDEA and state law.  (20 U.S.C. § 1415(h)(4); Ed. Code, § 56505, subd. (e)(5).)

Student was 16 years old and in the 11th grade at the time of hearing.  He resided within the boundaries of Atascadero Unified School District.  Student was eligible for special education under the primary category of Emotional Disturbance, now Emotional Disability, and the secondary category of Other Health Impairment.

## ISSUE 1: WAS THE CONDUCT FOR WHICH STUDENT WAS DISCIPLINED BY ATASCADERO CAUSED BY, OR DID IT HAVE A DIRECT AND SUBSTANTIAL RELATIONSHIP TO, HIS DISABILITIES?

### THE FIGHT ON AUGUST 20, 2024

In Issue 1, Student contends that his participation in a fight on campus on August 20, 2024, was a manifestation of his emotional disturbance because fighting, when behaviorally dysregulated, had been a central characteristic of his emotional disturbance since the second grade.  Atascadero contends that Student's participation in

the fight was not a manifestation of his disability because it was not impulsive and was instigated by a gang.

A special education student's placement is that unique combination of facilities, personnel, location or equipment necessary to provide instructional services to him. (Cal. Code Regs., tit. 5, § 3042(a).) The removal of a special education student from the student's placement for more than 10 consecutive school days constitutes a change of placement. (34 C.F.R. § 300.536(a)(i).)

When a district seeks to change a special education child's educational placement for more than 10 days as a result of a violation of a student code of conduct, the local education agency, the parent, and relevant members of the IEP team must review all relevant information in the student's file to determine whether the child's violation was a manifestation of the child's disability. (20 U.S.C. § 1415(k); 34 C.F.R. § 300.530 (2006).) This is known as a manifestation determination review. (20 U.S.C. § 1415(k)(1)(E).) A manifestation determination must be accomplished within 10 school days of the decision to change the student's placement. (Ibid.)

If the manifestation determination review team, called the MD team, determines the conduct was a manifestation of the child's disability, the team reviews and modifies the student's IEP to address the behavior and return the student to the special educational placement from which the student was removed, unless the parent and the local education agency agree to a change of placement. (20 U.S.C. § 1415(k)(1)(F).) If the team determines the conduct is not a manifestation of the student's disability, then normal school disciplinary procedures may be used to address the incident in the same way as they would be applied to non-disabled students, although the student's

education may be provided in an interim alternative educational setting.  (20 U.S.C.
§ 1415(k)(1)(C); 34 C.F.R. § 300.530(c)(2006); see *Doe v. Maher* (9th Cir. 1986) 793 F.2d
1470, 1480, fn. 8, affd. sub nom. *Honig v. Doe* (1988) 484 U.S. 305 [when a child's
misbehavior does not result from his disability, no justification exists for exempting him
from the rules applicable to other children].)

Conduct is a manifestation of the student's disability: (i) If the conduct in question
was caused by, or had a direct and substantial relationship to, the child's disability; or (ii)
If the conduct in question was the direct result of the local education agency's failure to
implement the individualized education program, called an IEP.  (34 C.F.R.
§ 300.530(e)(1) & (2)(2006).)  The manifestation determination analyzes the child's
behavior as demonstrated across settings and across times.  All relevant information in
the student's file, including the IEP, any observations of teachers, and any relevant
information from the parents must be reviewed to determine if the conduct was caused
by, or had a direct and substantial relationship to the student's disability, or was the
direct result of the district's failure to implement the student's IEP. (20 U.S.C.
§ 1415(k)(1)(E); 34 C.F.R. § 300.530(e)(1)(2006).)

The fight occurred on the campus of Atascadero High School in an open area
called the Quad.  The incident was captured on a digital surveillance camera that
produced black-and-white images showing the fight from some distance.  The video
was redacted to protect the privacy of third parties, and the final version of the redacted
video was admitted as Student's Exhibit 59.

When the fight occurred, it was passing time, and the Quad was crowded and
noisy.  Student was walking from one class to another when he turned around, strode

purposefully back toward a group of students, pushed an adult aside to pursue a student, and repeatedly hit that student with his fists and feet. Student continued the assault until it was interrupted by campus supervisors, who restrained and separated the combatants. The target of Student's attack, a student identified in the record as E.G.R., suffered a split lip and a swollen knee. Student was arrested and taken to Juvenile Hall, where he was confined for five weeks.

## THE SUSPENSION AND EXPULSION

After a manifestation determination review on October 9, 2024, Atascadero proposed to Parent and Student that they waive Student's right to a hearing before the School Board and stipulate to Student's expulsion. In return, Atascadero offered to transfer Student promptly to Loma Vista Community School, a county therapeutic facility. Parent and Student signed the agreement, which was later ratified by the School Board. Loma Vista did not accept Student, and he has been out of school since that time.

## STUDENT'S CONDUCT ON AUGUST 20, 2024, HAD A DIRECT AND SUBSTANTIAL RELATIONSHIP TO HIS DISABILITY OF EMOTIONAL DISTURBANCE

### STUDENT HAD A LENGTHY HISTORY OF MANIFESTING HIS EMOTIONAL DISTURBANCE BY FIGHTING

Student's tendency to fight when dysregulated appeared at least as early as the second grade. Atascadero's records do not go back any further.

Student attended Atascadero's San Benito Elementary School from second grade to fifth grade.  In second grade, he was involved in numerous disciplinary incidents that usually included violence such as fighting.  His disciplinary record for the 2015-2016 school year shows eight disciplinary incidents, seven of which involved violence.  The most frequent description of the incidents was "caused, attempted, threatened physical injury."

Student was given an IEP in the second grade and, at the end of the year, was transferred to the Therapeutic Learning Center at Atascadero's Fine Arts Academy.  Student stayed there through fifth grade and for most of sixth, seventh, and eighth grades.

Student's placement in the Therapeutic Learning Center coincided with a slight reduction in reported emotional outbursts, but they were still numerous.  He was involved in 11 assertive discipline incidents between February 2020 and May 2022.  The nature of the incidents varied, including an instance of online bullying and an incident in which he brandished a knife, but most of them were for harassment, threats, or outright violence against peers or staff.  Student was arrested once in middle school, but the record does not explain why.

In March 2022, Student's IEP team, including Parents, decided that Student would be better placed at a residential treatment center.  They chose Discovery Ranch for Boys in Mapleton, Utah, which Student began attending in May 2022.  Student's younger brother, known in the record as "K.G.", also had an IEP and a disciplinary record similar to Student's.  Atascadero also placed K.G. in Discovery Ranch.

Student was able to make substantial progress at Discovery Ranch in regulating his behavior, although he was still involved in numerous instances of behavioral misconduct.  Between May 2022 and September 2023 at Discovery Ranch, Student was involved in 12 behavior emergency reports or incident reports.  These incidents typically involved verbal aggression, elopement, or attacking peers or staff.

Student's progress at Discovery Ranch was interrupted in September 2023 when Father appeared in Utah, revoked consent to his and his brothers' placements at Discovery Ranch, and took them home to Atascadero.  Student's removal from Discovery Ranch was against medical and clinical advice, because he had not completed his course of treatment there.

After Student returned to Atascadero in September 2023, he did not immediately attend a traditional school.  The record at hearing includes few details about this period of time, but it does show that Student's Mother enrolled him in an online course in which he was not successful.  In the fall, Student spent some time in Juvenile Hall and obtained a few credits from the Juvenile Hall Court School.

In January 2024, Student, his brother, and a family friend who was a known gang member, engaged in verbal and physical aggression in a dispute with a nearby resident. On February 9, 2024, Student and his brother were involved in a serious assault in the parking lot of an apartment house.  Student was on probation, which was revoked. Because of the event on February 9, he eventually pleaded guilty or nolo contendere to a charge of violating Penal Code section 245, subdivision (a)(4), which prohibits assault by force likely to produce great bodily injury.

In February 2024, Atascadero conducted a series of assessments of Student in preparation for his triennial review in April.  Student had been released from Juvenile Hall on March 7, on probation and with an ankle monitor.  However, by the time of his April 10, 2024 IEP team meeting, he was once again incarcerated.  Atascadero's School Psychologist Alisa Scheuring met Student at both the school and in Juvenile Hall.

In her psychoeducational assessment dated April 10, 2024, Scheuring described the reasons for Student's referral for assessment.  Scheuring wrote that he had difficulty in the self-control of emotions in the school environment but not at home.  When experiencing emotional distress at school, Student engaged in behaviors such as verbal protests, threats, elopement, property destruction, physical aggression, and emotional outbursts, some of which disrupted the learning environment and posed safety concerns.  In her report, Scheuring wrote that sometimes Student had "catastrophic" reactions to everyday occurrences.

School psychologist Scheuring personally experienced three of these manifestations while assessing Student.  In a session at the middle school, Student twice became visibly upset, was red in the cheeks, and could not sit still or concentrate.  Twice he left the room for breaks.  On his return the second time, he told Scheuring that looking out the window toward the middle school reminded him of unpleasant experiences at a nearby school.  In a session at Juvenile Hall, an alarm bell started ringing, causing Student to bang on the door, yell profanely at the guards, and demand that the bell be silenced.

Student was unusually oversensitive to indications of disrespect.  He was particularly offended by the "dissing" of someone he liked or respected, even though

the insult was not directed at him. In one class he was so upset when another student was disrespectful to the teacher that he had to leave the classroom.  Atascadero resolved this problem by moving Student's seat away from the disrespectful peer.

At the April 10, 2024 IEP team meeting, Parent and Atascadero staff agreed upon an IEP that would allow Student to finish the 2023-2024 school year by attending two classes on the high school campus.  It also provided for one-to-one instruction in the extended school year. Student attended during those periods without incident.

August 20, 2024, was Student's first day of returning to a full day at a traditional school.  At Atascadero High School, he was unable to control his emotional outbursts even to the end of the day.  He began the day in a science class, but became so angry that he could not have his preferred chair that he had to take breaks outside the classroom.  He was still angry when he walked across the Quad in the afternoon and became involved in the fight that led to his expulsion.

## THE TESTIMONY OF DR. SOLOMON

Student presented the testimony of a persuasive expert witness, Dr. Paula Solomon.  Dr. Solomon is a state-licensed psychologist who for approximately 25 years was the clinical director of TLC Child and Family Services, a residential and outpatient service in Sebastopol specializing in treating emotionally disturbed children and adolescents.  She has been a social worker, a family therapist, a writer and a lecturer on the subject of the assessment of children, and a consultant or clinical director for numerous treatment centers.  Throughout her career, Dr. Solomon has specialized in the treatment of emotionally disturbed children and adolescents.

Dr. Solomon recently spent about an hour with Student.  She reviewed his educational records, including psychological evaluations, IEP's and discipline records. She also studied the video of the fight on August 20, 2024.  At hearing, Dr. Solomon described Student as unusually intense, highly reactive, and highly emotionally unstable. She opined that Student's behavior during the fight on August 20, 2024, was predictable, and had a direct correlation to his disability, emotional disturbance.

Since Dr. Solomon's career has been centered around children and adolescents with emotional disturbances, she was especially well qualified to form an opinion about Student's conduct on August 20, 2024.  She testified carefully and with restraint. Dr. Solomon candidly admitted some of the shortcomings of her limited exposure to Student, which are stressed in Atascadero's closing brief.  However, the substance of her testimony and opinion was undamaged on cross-examination.  Dr. Solomon was a credible witness, and her testimony is given substantial weight.

Notably, Atascadero did not present any expert testimony directly contradicting the substance of Dr. Solomon's opinion.  School psychologist Scheuring, whose credentials were typical for her position, instead concentrated on explaining that she did not think Student's conduct was a manifestation of his disability because it was not spontaneous but had been done at the direction of others.

Javier Gonzales, the inexperienced school psychologist who led the manifestation determination review meeting, also testified that Student had not manifested emotional disturbance on August 20, 2024, because Student's conduct did not appear spontaneous.  Instead, he was executing an instruction he was given.

As shown here, the opinions of Scheuring and Gonzales were based on misinformation about the event and are given less weight than Dr. Solomon's opinion.

## THE MANIFESTATION DETERMINATION WAS INCORRECT

### THE MD TEAM HAD NO INFORMATION ABOUT THE FIGHT ON ITS OWN

Student was released from Juvenile Hall on September 26, 2024, after which Atascadero began proceedings to expel him. Atascadero conducted the manifestation determination review on October 9, 2024.

School psychologist Javier Gonzales was selected to lead the meeting. Gonzales was a recent arrival at the school. It was his first full year as a school psychologist, and he had previously experienced only one manifestation determination. He wrote a report for distribution to the MD team that was based entirely on information given to him by assistant principal Mike Gilmore. Gilmore, in turn attributed his version to Sid Rodriguez and Darvell Cullors, two campus supervisors who were involved in the event but not invited to participate in the MD team meeting.

The rest of the MD team consisted of:

- assistant principal Mike Gilmore,
- program coordinator Leandra Santoianni,
- school counselor Lisa Fiore,
- Student,
- Student's brother,

- Student's parent, and

- a general education teacher.

The meeting lasted half an hour.  All of the Atascadero team members decided that Student's conduct was not a manifestation of his disability.  Student and Parent did not agree.

The composition of the MD team, though lawful, deprived it of essential first-hand information.  Atascadero was entitled to select the team members and was not required to invite percipient witnesses.  However, campus supervisors Cullors and Rodriguez were the most important witnesses to the event, and even physically involved in it.  There was no evidence that their understandings of the event were adequately conveyed to the MD team, if conveyed at all.  School psychologist Scheuring had recently conducted an extensive psychoeducational assessment of Student, but she was also not part of the team.  No one on the team had any personal knowledge of the event, which made an accurate description of the facts especially necessary.

## THE MD TEAM WAS MISINFORMED ABOUT THE FACTS

School psychologist Gonzales presented a written report to the MD team.  The report described the incident as follows, and referred to Student as "EG":

Student A told EG to "get him" Student B pushed Student C to the ground. Students B and C began to fight EG hit Student C multiple times when he was the ground.  Adults tried to break up the fight, but EG continued to try to attack Student C, pushing on staff.

Gonzales copied this description nearly verbatim from the notice of suspension written by Gilmore on September 30, 2024. Gilmore was not a witness to the event either, and attributed his information to Rodriguez, Cullors, and Corporal Tyler Smith, the school's resource officer, who was summoned to the scene and arrived about 10 minutes later.

The description of the event that Gonzales presented to the MD team was so minimal that it was unhelpful. The description also directly contradicted the opinions of Atascadero's campus supervisors who were percipient witnesses to the fight. The weight of evidence showed that there was an angry exchange between Student and E.G.R. less than 20 seconds before the fight began. It showed that Student most likely attacked E.G.R. for calling him a "fucking bitch." The MD team had no knowledge of that aspect of the event.

## THE TESTIMONY OF DARVELL CULLORS

Campus Supervisor Darvell Cullors had been helping keep the peace on the Atascadero High campus for 31 years. He cannot be seen in the video, but he testified that he was right around the corner from the events depicted. He had just intervened in a verbal dispute between two students with the initials E.G.R and D.B. Cullors approached the aggressor, D.B., and held him back from going after E.G.R. D.B. then raised his voice and said, "get him." Cullors thought D.B. was talking to E.G.R., the student with whom he was having a dispute. At least some other people in the Quad could hear what D.B. said. Cullors did not hear D.B. say anything to Student, either before or during the altercation. Cullors could not tell whether Student heard D.B. say

"get him," nor did he know whether D.B.'s "get him" statement was made before the fight started or when it was already underway.

Cullors established that Rodriguez was just behind him at first, but when Cullors saw a commotion out of the corner of his eye, he turned around and saw Rodriguez trying to restrain Student.  The video shows that by then, Rodriguez had moved to the center of the Quad, but Cullors was still out of sight around the corner, about 15 to 20 feet away from Rodriguez.

Cullors continued to hold D.B., then told him to stay where he was while he went to help Rodriguez.  D.B. obeyed.  Cullors went to the scene of the fight and restrained Student's brother.

Cullors also established that just after the fight, Student seemed very calm when Cullors walked by him.  Then he looked "re-elevated."  After everyone had dispersed, Cullor's heard Student say to his brother, "Sorry; we messed up."

## THE TESTIMONY OF SID RODRIGUEZ

Sid Rodriguez had been a campus supervisor for Atascadero for 19 years. Rodriguez knew Student well.  He had walked and talked with him, and once took him to a baseball game.  Rodriguez's description at hearing of the events of August 20, 2024, corroborated supervisor Cullors's testimony in all important respects.

On the day of the fight, Rodriguez was on a golf cart at the Quad, talking with Cullors, who reported that something was happening.  The two went to investigate.

Rodriguez saw Student walking across the Quad toward the area where he usually met his friends.  E.G.R. was walking one way and Student the other way. Rodriguez heard an exchange of vulgar words between Student and E.G.R., although the Quad was too noisy for him to hear what was said.  The two students were saying things "in the heat of the moment."  Rodriguez noticed Student "escalating a little bit" so he grabbed Student from behind.  He did not hear anyone say, "get him."  Student was trying to get to E.G.R.

Rodriguez established that Student's brother K.G. then got involved and pushed E.G.R. from behind.  E.G.R. fell, Rodriguez let go of Student, and a fight broke out. Rodriguez tried to restrain K.G. from reaching E.G.R.  Student, freed from Rodriguez's restraint, hit E.G.R. with his fists and feet, and did not stop on command.  He had to be pulled away.  According to Rodriguez, it took Student, "a little bit of time" to cool off.

The video is consistent with the version of events described by Cullors and Rodriguez, but not the version given to the MD team.  On the video, Student can first be seen walking normally toward the left side of the video frame.  E.G.R. walked past him going the other way.  Each student's head briefly turned toward the other.  Student then abruptly turned around and started following E.G.R. at a determined pace, looking angry.  Campus supervisor Rodriguez, seeing Student coming, put himself between Student and E.G.R., but Student shoved his way around Rodriguez and slipped behind him to assault E.G.R.  Student's brother pushed E.G.R. to the ground.  E.G.R. quickly got up, but Student had arrived and began punching him.  E.G.R. went down again and Student kicked him.  Student did not stop until he was physically pulled away from E.G.R. and restrained.

## STUDENT'S TESTIMONY

Student's testimony at hearing was consistent with that of the campus supervisors. Student had declined to explain the event at the MD team meeting on October 9, 2024, saying only that he did not hear anyone say, "get him" and would not fight someone else's fight. Mother testified that she had advised him not to discuss the details of the incident because of the upcoming Juvenile Court proceeding.

However, by the time of hearing, Student chose to testify, and to describe the incident. He did not hear anyone say, "get him." As he went by E.G.R, the latter called him a "fucking bitch." This angered Student and caused him turn around, follow E.G.R., and attack him. Student's version of events is entirely consistent with the video, but the MD team was not aware of it.

Between the manifestation determination review and this due process hearing, Student three times described to others being provoked by student E.G.R. The first time was to his Mother. The second time was to his Probation Officer Anabel Molina, who confirmed the statement at hearing. The third time was to Dr. Solomon, who established that Student told her he attacked E.G.R. because of a "diss", a disrespectful statement, that he was a "fucking bitch." If he had been provoked in that way, his conduct would be entirely consistent with many previous instances in which his emotional disability had made him quick to anger, and to engage in violence.

## ATASCADERO'S CONTENTIONS

Atascadero points out that none of its staff heard E.G.R. insult Student, but that does not mean it did not occur. The Quad was crowded and noisy, and the insult

occurred when the two students passed each other.  The video is consistent with a brief
exchange of some kind.  Campus supervisor Rodriguez heard them exchange vulgarities.

Atascadero argues in its brief that Student's involvement in the fight on
August 20, 2024, could not have been a manifestation of his emotional disturbance
because there was no evidence that his cheeks were red.  This argument refers to the
testimony and writings of District witnesses who agreed that, when Student became
upset and acted out, his face turned red.  Since there was no proof his face was red
before or during the fight, Atascadero reasons, he could not have been acting out of his
emotional disturbance.

In a related argument, Atascadero points out that its staff consistently reported
that after engaging in extreme behavior, it takes Student a long time to calm down.
Several witnesses testified that Student was calm after the fight, but how long after the
fight is not clear in the record.  A relatively quick recovery, Atascadero argues, shows
that Student's actions were not driven by his emotional disturbance.

Finally, Atascadero relies on a previous incident in which a teacher heard a
student insult Student, but Student controlled himself and did not respond.  As
confirmed by Dr. Solomon, it may be true that Student had learned some coping skills,
but the fact that he could restrain himself on one occasion does not mean he could
restrain himself on another.

Evidence stronger than red cheeks and de-escalation time showed that when
Student went after E.G.R., he was escalated and angry.  While the video was not
conclusive, Student does look angry as he pursues E.G.R.  The black-and-white
surveillance video does not show whether his cheeks were red.

The witness in the best position to know Student's mental state when the fight began was campus supervisor Rodriguez, whom Student pushed to get him out of the way so he could pursue E.G.R. Rodriguez testified at hearing that Student "became heated" as he pursued E.G.R., and that Student "took a while to calm down."  Rodriguez testified that he believed Student attacked E.G.R. because of what E.G.R. said to him. Student's conduct, Rodriguez thought, was "a reaction to what was said."  Rodriguez's first-hand observations were more reliable than the inferences about red cheeks and rapid de-escalation drawn by Atascadero.

## THE MD TEAM APPLIED UNDULY RESTRICTIVE STANDARDS

Most of the members of the MD team testified at hearing and explained why they reached the conclusion they did.  Two themes emerged from their testimony. First, all Atascadero members decided that the fight was not spontaneous.  Second, most members thought that Student was acting at the direction of his gang.

It is not clear why the MD team chose to rely on those two observations. Apparently, no one on the MD team thought to ask why those two measures mattered. Legally they did not.  The definitions of emotional disturbance in state and federal law have no such limitations.  An emotionally disturbed person can plan an event and still engage in it as a result of emotional disturbance.  One federal court has squarely rejected the claim that evidence of planning precludes a finding that conduct was a manifestation of emotional disturbance.  (See *Jay F. v. William S. Hart Union High Sch. Dist.* (C.D.Cal., August 2, 2017, CV 16-05117 TJH (GJSx)) 2017 WL 6549911, *7, aff'd 772 Fed.Appx. 578 (2018) (nonpub. opn.)("That A.F.'s conduct was 'pre-planned' is not

sufficient to demonstrate that the January conduct was not substantially related to A.F.'s
disability [emotional disturbance].")

An emotionally disturbed person can also do something at the direction of
someone else, and still be driven by emotional disturbance.

## THE FIGHT DID NOT INVOLVE GANG ACTIVITY

Involvement of a gang in undesirable activity does not forfeit the protection of
the IDEA, nor does it preclude a finding that, even for gang-sanctioned conduct, a
violent act may be driven by emotional disturbance.

Student, his brother and D.B. were known to associate with Norteños.  E.G.R. was
known to associate with Sureños.  However, their gang associations do not mean that
their every act was conceived or instigated by the gang.  Nothing in the record shows
that either gang was involved in the events leading up to the fight on August 20, 2024.

Campus supervisor Cullors's description of his restraint of D.B. suggests that
D.B.'s statement, "get him" was spontaneous when he could not escape the supervisor's
grasp.  There was no evidence that the phrase was directed to Student, who testified
that he did not hear anyone say, "get him."  Student was near Rodriguez at the time, and
Rodriguez did not hear, "get him" either.

Cullors's first reaction was that "get him" concerned D.B.'s dispute with the
student whom Cullors separated from D.B.  That was not Student or his brother.  There
was no evidence that D.B. was in any position to tell Student what to do.  The
manifestation determination documents and the testimony of the team members

contained inferences about the involvement of Student's gang in the events of
August 20, 2024, that the evidence does not support.

The weight of the evidence showed that Student did not attack E.G.R. at the
direction of a gang.  He attacked E.G.R. in response to a vulgar verbal provocation,
making his action another incident among the many previous incidents in which his
disability overcame his restraint.

In short, the preponderance of evidence supports the finding that Student's
engagement in the fight on August 20, 2024, had a direct and substantial relationship to
his disability of emotional disturbance.  Dr. Solomon persuasively testified that it did,
and the less experienced school psychologists presented by Atascadero did not directly
contradict that view.  A fair interpretation of the video shows an angry exchange
between Student and E.G.R. just before the fight.  The testimony of the two campus
supervisors was consistent with Student's testimony and showed that the event had its
origin in an insulting exchange between Student and E.G.R.  The incident was similar to,
and consistent with, the many historical instances of violence rooted in Student's
emotional disturbance.

## STUDENT'S DUE PROCESS COMPLAINT IS NOT BARRED BY THE STIPULATED EXPULSION AGREEMENT HE AND MOTHER SIGNED

When the MD team meeting ended, Atascadero asked Parent and Student to sign
a document stipulating to Student's expulsion and waiving any rights to the procedures
surrounding a formal expulsion, such as a hearing by the School Board.  Atascadero
stated that in return it would promptly enroll Student in a continuation school called

Loma Vista, which was run by the County Office of Education.  The stipulated expulsion document recited that Student and Parent "relinquish their right to contest any expulsion order and make a knowing and voluntary waiver of their right to have an expulsion hearing . . ."

Atascadero now argues that the filing of Student's due process complaint is a method of challenging the expulsion and is therefore barred by the stipulated expulsion agreement.  However, in the agreement Parent and Student waived only their rights to contest "any expulsion order" and have "an expulsion hearing."  This due process complaint does not challenge the expulsion itself.  It challenges the correctness of the manifestation determination required by federal law.

The same argument Atascadero makes here was rejected in *Jay F. v. William S. Hart Union High Sch. Dist., supra,* 2017 WL 654991, at p. *5, on the grounds that the agreement did not contain an express waiver of IDEA rights, and in the case of ambiguity had to be construed against the author of the agreement.  (See also Civ. Code, § 1654.)

(This space is intentionally left blank. Text continues on the following page.)

ISSUE 2: DID ATASCADERO FAIL TO CONSIDER ALL RELEVANT
INFORMATION IN CONNECTION WITH THE MANIFESTATION
DETERMINATION REVIEW PROCESS, NAMELY, RELEVANT INFORMATION
CONCERNING HIS ATTENTION DEFICIT HYPERACTIVITY DISORDER, HIS
IMPULSE CONTROL, HIS EMOTIONAL AND BEHAVIOR REGULATION, AND
HIS HISTORY OF FIGHTING?

Since Student prevailed on Issue 1, it was not necessary to decide this issue.  If
Student were also to prevail on Issue 2, the relief that would be ordered would simply
duplicate the relief that will be ordered because of the findings on Issue 1.

## CONCLUSIONS AND PREVAILING PARTY

As required by California Education Code section 56507, subdivision (d), the
hearing decision must indicate the extent to which each party has prevailed on each
issue heard and decided.

ISSUE 1: WAS THE CONDUCT FOR WHICH STUDENT WAS
DISCIPLINED BY ATASCADERO CAUSED BY, OR DID IT HAVE A DIRECT
AND SUBSTANTIAL RELATIONSHIP TO, HIS DISABILITIES?

Student proved that the conduct for which he was expelled had a direct
and substantial relationship to his disability of emotional disturbance.

Student prevailed on Issue 1.

ISSUE 2: DID ATASCADERO FAIL TO CONSIDER ALL RELEVANT
INFORMATION IN CONNECTION WITH THE MANIFESTATION
DETERMINATION REVIEW PROCESS, NAMELY, RELEVANT
INFORMATION CONCERNING HIS ATTENTION DEFICIT
HYPERACTIVITY DISORDER, HIS IMPULSE CONTROL, HIS EMOTIONAL
AND BEHAVIOR REGULATION, AND HIS HISTORY OF FIGHTING?

This issue was not decided because Student prevailed on Issue 1.

REMEDIES

Student prevailed on Issue 1. As a remedy, Student requests that he be placed in
an alternative educational setting, with the supports and services identified in his
previous IEP, and with one-to-one support. Atascadero disagrees because it argues that
Student is entitled to no relief.

An ALJ may order that a special education student be returned to his or her
original placement if the ALJ determines that the conduct was a manifestation of the
student's disability or the result of the failure to implement the student's IEP. (20 U.S.C.
§ 1415(k)(3)(B); 34 C.F.R. 300.532(a) & (c)(2006).) However, the parties agree and the ALJ
finds that maintaining Student's current placement is substantially likely to result in
injury to him or others. (See 20 U.S.C. § 1415(k)(3)(A).) Section 1415(k)(3) does not limit
a hearing officer from awarding other equitable remedies to craft appropriate relief. (20
U.S.C. § 1415(k)(3); *Parents of Student W. v. Puyallup School Dist. No. 3* (9th Cir. 1994) 31
F.3d 1489, 1497.)

In this situation, the ALJ may order a change in placement to an appropriate
interim alternative educational setting for not more than 45 school days (20 U.S.C.
§ 1415(k)(3)(B)(ii)(II); 34 C.F.R. § 300.532(b)(2)(ii)(2006) provided the child will continue to
participate in the general education curriculum and to progress toward meeting the
goals set out in the child's IEP (20 U.S.C. § 1415(k)(1)(D)(i); 34 C.F.R. § 300.530(d)(2006)).
The interim alternative educational setting must also enable the child to receive, as
appropriate, a functional behavioral assessment, and behavioral intervention services
and modifications that are designed to address the behavior violation so that they do
not recur (34 C.F.R. § 300.530(d)(1)(ii))(2006).

As found above, and as the parties agree, Student's return to Atascadero High
School would be substantially likely to result in injury to him or others.  For the same
reason, any 45-day interim placement should not be on a comprehensive high school
campus.  Nor should Student be placed in a residential treatment center for the 45-day
period, unless the parties agree otherwise.  Student has not been in a residential
treatment center since September 2023, and given his difficulties since then, his needs
have almost certainly changed.  Placement in a residential treatment center would also
be highly restrictive and might not be the least restrictive environment for him.
Atascadero will therefore be ordered to seek an intermediate placement for the 45 days
that is consistent with the advice of Dr. Solomon.

School districts may be ordered to provide compensatory education or additional
services to a student who has been denied a FAPE.  (*Student W. v. Puyallup School Dist.,
supra,* 31 F.3d at p. 1496.)  These are equitable remedies that courts may employ to craft
appropriate relief.  Student requests compensatory education if he prevails in the
non-expedited portion of this hearing, but does not request compensatory education as

relief in this expedited part of the due process hearing.  This potential remedy is
therefore postponed until OAH conducts the non-expedited portion of the hearing,
when both the parties and the ALJ are better informed concerning what compensatory
relief, if any, should issue.

(This space is intentionally left blank. Text continues on  the following page.)

ORDER

1. Atascadero's decision that Student's conduct on August 20, 2024, was not a manifestation of his disability is reversed.

2. As an interim alternative educational placement for 45 days from the date of this Decision, Atascadero shall expeditiously place Student in an alternative educational environment capable of implementing his IEP and with one-to-one support.  This environment shall not be a residential treatment center or on a comprehensive high school campus.

3. Atascadero shall conduct a functional behavioral assessment of Student during the 45-day period and shall convene an IEP team meeting to develop a behavior intervention plan within 15 days after the assessment is completed.

4. A decision on any further relief is deferred until the conclusion of the non-expedited hearing.

## RIGHT TO APPEAL THIS DECISION

This is a final administrative decision, and all parties are bound by it.  Pursuant to Education Code section 56505, subdivision (k), any party may appeal this Decision to a court of competent jurisdiction within 90 days of receipt.

*Charles Marson*

Charles Marson

Administrative Law Judge

Office of Administrative Hearings